

Heath Law
PLLC.

# EXHIBIT 1



RYAN L. HEATH, ESQ. (Bar No. 036276)
**Heath Law, PLLC**
16427 N. Scottsdale Road, Suite 370
Scottsdale, AZ 85254
(480) 432-0208
stephen.walker@heathlaw.com
ryan.heath@heathlaw.com
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Shai Segui and DOES 1-100,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Stephanie Stromfors, in her personal capacity; Diana Vigil, in her personal capacity; Randy Rand, in his personal capacity; Julie Verner, in her personal capacity; Yvonne Parnell, in her personal capacity; Dr. Raymond Branton, in his personal capacity; Donna Moniz, in her personal capacity; Building Family Bridges, in its official capacity; Unidentified Employees Agents, Contractors, and Owners of Building Family Bridges; DOES 1-100,<br><br>　　　　Defendants. | CASE NO.2:24-CV-01171-DMF<br><br>**FIRST AMENDED COMPLAINT**<br><br>1) **Violation of Civil Rights (42 U.S.C. § 1983, 14th Amendment Procedural and Substantive Due Process)**<br>2) **Conspiracy to Violate Civil Rights (42 U.S.C. § 1983)**<br>3) **Retaliatory Harassment (42 U.S.C. § 1983)**<br>4) **Violation of First Amendment Right to Freedom of Association**<br>5) **Battery**<br><br>**JURY TRIAL REQUESTED** |

COMES NOW SHAI SEGUI, in his individual capacity and alleges as follows

///

///

///

- 1 -



**THE PARTIES**

1.     SHAI SEGUI ("Shai" and/or "Plaintiff") was a minor child at the time the allegations herein occurred. At all times relevant herein, Shai was a natural person residing in Maricopa County, Arizona.

2.     Defendant STEPHANIE STROMFORS ("Stromfors") was, at all times relevant to this Complaint, doing business in Maricopa County, Arizona,.

3.     Defendant DIANA VIGIL ("Vigil"), was, at all times relevant to this Complaint, doing business in Maricopa County, Arizona.

4.     Defendant RANDY RAND ("Rand") is the owner and founder of Building Family Bridges and, at all times relevant to this Complaint, did business in Maricopa County, Arizona.

5.     Defendant BUILDING FAMILY BRIDGES ("BFB") is a foreign business entity which, at all times relevant to this complaint, did business in Maricopa County, Arizona.  Upon information and belief, its business address is 302 Vista Del Valle, Mill Valley, CA 94941.

6.     Defendant Dr. RAYMOND BRANTON ("Branton") is a psychologist, licensed in the state of Arizona and, at all times relevant to this Complaint, a resident of Maricopa County, Arizona, and an appointed Therapeutic Interventionist for the Maricopa County Courts.

7.     Defendant JULIE VERNER ("Verner") was, at all times relevant to this Complaint, doing business in Maricopa County, Arizona.

8.     Defendant YVONNE PARNELL ("Parnell") was, at all times relevant to this Complaint, doing business in Maricopa County, Arizona.

FIRST AMENDED COMPLAINT

9.      Defendant DONNA MONIZ ("Moniz" and/or "mother") is the mother of Shai and was, at all times relevant to this Complaint, a resident of Maricopa County, Arizona.

10.     Doe Defendants 1-100 are sued fictitiously in that their correct names and legal identities are currently unknown to Plaintiff.  Said Doe Defendants participated with the named Defendants as agents, employees, servants, masters, principals, partners, limited partners, subsidiary corporations, contractors, or other types of business or professional associations in providing whose breaches in duties will not become known to Plaintiff until discovery progresses.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 ~~and 1985~~, 28 U.S.C. §§ 1331, 1332, and 2201(a). Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in the District of Arizona under 28 U.S.C. § 1402(b) as Plaintiff, Shai, resides in Phoenix, Arizona.

## FACTUAL ALLEGATIONS

13.     Throughout his childhood, Shai was physically, sexually, and emotionally abused by his mother.

14.     Between the ages of three and ten, Moniz would frequently sleep naked with Shai, encourage him to "play" with her breasts and, on one occasion around December of 2012, Shai woke up in the middle of the night on top of his mother while they were both naked. As the years progressed and Shai matured, he became increasingly uncomfortable with his mother's sexual antics.

FIRST AMENDED COMPLAINT

15.     Shai's parents, David Segui and Donna Moniz, filed for divorce in 2015, resulting in a lengthy custody battle over Shai and his younger brother. This battle played out in a lengthy family court proceeding in the Superior Court of Maricopa County under the Case Number FC2015-004537.

16.     A Decree of Dissolution was entered by the Maricopa County Superior Court on July 20, 2017.  Shai was 11 years old.

17.     From the very outset of the divorce and throughout the family court proceedings, Shai consistently maintained that Moniz was physically, sexually, and mentally abusive and, therefore, he requested to live exclusively with his father.

18.     Throughout the family court proceedings, Shai was ordered by the family court to see a multitude of therapists and other court-appointed practitioners, including Defendants Branton, Vigil, Verner, and Parnell. Additionally, Shai was ordered by the family court to see other court-appointed practitioners, including Dr. Moran, Dr. Lavit, Dr. Joel Covert, Dr. Kolette Butler, Dr. Petty, and Dr. Jones.

19.     Upon information and belief, for each of these therapists and court-appointed practitioners, Shai consistently claimed that Moniz had physically, sexually, and mentally abused him and, therefore, he did not wish to see her—let alone live with her.

20.     Rather than reporting the abuse as required under A.R.S. § 13-3620, the foregoing Defendants, upon information and belief, chose to withhold the reported abuse for their own financial benefit.

21.     Upon information and belief, Branton, while serving as a court-appointed therapist for Shai, was informed by Shai's mother that she had physically abused him and



his brother in the past. Despite mother's admission, Branton did nothing to protect Shai or his brother or to inform proper authorities as is required by A.R.S. § 13-3620.

22.     During his time involved in Shai's case, Branton repeatedly represented to the family court that reunification therapy was not recommended—absent "weeks" of intensive therapy to prepare Shai and his brother for the process. ***See e.g.,* Exhibit A, April 17, 2019, Treatment Summary, p. 3, Dr. Raymond E. Branton, PsyD.**

23.     Upon information and belief, pursuant to BFB's rules, participants are not permitted to attend "weeks" of intensive therapy to prepare them for the reunification camp.

24.     On or about February 10, 2020, Branton met with Shai and his brother for a court-appointed therapy session.

25.     During this session, Branton accused both Shai and his brother of lying about their allegations of mother's abuse.

26.     At the end of this appointment, both Shai and his brother "cussed out" Branton and informed him that they would not meet with him again.

27.     On or about June 2, 2020, Branton withdrew from the case after hearing that father might have recorded a conversation with him wherein Branton admitted that mother had reported to him that she had physically abused Shai and his brother.

28.     A few months after withdrawing from Shai's case, on or about November 11, 2020, Branton was contacted by Vigil and stated to her, knowing that she was working on Shai's case, that he fully supported Shai and his brother immediately attending BFB.

29.     This was a stark reversal from Branton's prior position.

FIRST AMENDED COMPLAINT

30.     Upon information and belief, Branton had not seen Shai or his brother since February of 2020 and had no new medical information on which this reversal of opinion was based.

31.     Upon information and belief, Shai reported mother's abuse to Defendant Vigil and, rather than reporting the abuse to the appropriate authorities as required under A.R.S. § 13-3620, Defendant Vigil chose to withhold the reported abuse for her own financial benefit.

**(Order for Reunification Therapy)**

32.     In November of 2020, Stromfors was appointed by the court to be Shai's Best Interest Attorney ("BIA"), with the same duties and obligations to Shai as is expected in a typical attorney-client relationship.

33.     The order appointing Stromfors as the BIA failed to align with the requirements of Rule 10. Ariz. R. Fam. Law. Proc. 10. *See* Exhibit B.

34.     There was no finding that Shai's father was "unfit" to act in the best interest of Shai or his brother prior to Stromfors' appointment as BIA.

35.     On information and belief, Stromfors has been appointed as a BIA in a plethora of other cases similar to Shai's—wherein the same playbook (unsubstantiated allegations of "severe alienation") is used by the same parties (Stromfors, Vigil, Rand, and BFB) to separate children from their loving, non-abusive parent only to reunite that child with his or her abusive parent. In fact—Shai has a long list of individuals ready to testify to prove this point.

36.     Stromfors's position as BIA, in Shai's case and others, has shown a pattern of consistently claiming "severe alienation" and recommending a preferred reunification camp: BFB.

37.     Stromfors pattern involves mostly the same actors: Vigil, Rand, BFB, and the family court.

38.     On December 1, 2020, Vigil, the court appointed Therapeutic Interventionist ("TI"), advised the family court that Shai would need more intensive therapy to reunify him with his mother. *See* Exhibit C.

39.     Accordingly, Vigil recommended a single, highly intensive "reunification camp": BFB. *See* Exhibit C.

40.     On information and belief, BFB—while not even ordered by the Court yet—had already received a deposit paid for by Defendant Moniz for Shai and his brother to attend.

41.     On further information and belief, this deposit was paid following conversations between Moniz, her attorney, Vigil, Stromfors, and Rand. *See* Exhibit D.

42.     On December 28, 2020, Stromfors—without any rational justification for doing so—filed an Emergency Motion (under the guise of alleged "severe alienation") for Shai and his brother to "temporarily" be placed in their mother's exclusive physical and legal custody and to suspend all contact with their father.

43.     The Emergency Motion, which is impermissibly replete with Stromfors's opinions such that it amounts to a report in violation of Arizona Rule of Family Law Procedure, Rule 10, specifically mentions that if the proposed Emergency Order



accompanying it is not issued, Shai and his brother "will be irreparably harmed." *See* Exhibit D.

44.     The Emergency Motion, <u>which the family court did not even request,</u> had no good faith basis upon which to file – there was no concern that Shai's father was abusing him, nor were there any credible accusations (from uninterested parties) of imminent harm.

45.     Indeed, the Emergency Motion—despite claiming that Shai was in imminent harm while in the care of his father—did not even recommend that Shai be taken out of the custody of his father until weeks later.

46.     Even though there were no accusations regarding abuse by father at the time the Emergency Motion was filed, there *were* credible accusations made by Shai, his brother, and his father that Moniz had been abusing Shai and his brother physically, sexually, and mentally. *See* Exhibit C.

47.     The Emergency Motion alleged that Shai's mother was the "alienated", or "rejected", parent and Shai's father was the "preferred" parent. *See* Exhibit D.

48.     Because Shai showed his father preferential treatment (given that he was not abusive, unlike mother), Stromfors recommended Shai be stripped of his father's physical and legal custody and care and be placed exclusively with his abusive mother. This is patently illogical, considering that the point of Shai being appointed a BIA was to represent *his* best interests, not her own, BFB's, Rand's, Vigil's, or mother's.

49.     Further, the Emergency Motion requests the **suspension of father's parenting time** solely because mother had not made a meaningful connection with Shai— a child that she had abandoned many years earlier (even before the divorce) with no



meaningful efforts to connect with him until after the filing of the Emergency Motion. *See* Exhibit D.

50.     Shai's liberty interest in familial association with his father was unlawfully revoked simply because Shai's abusive mother was not received by him and his brother in a way that made her happy.

51.     Stromfors, Vigil, BFB, and Rand saw Shai's predicament (as a helpless child—caught between an abusive mother and a loving and wealthy father going through a contentious custody battle) as an opportunity to drag out the family court proceedings and, thereby, make money.

52.     At all times relevant herein, Defendants Stromfors, Vigil, Rand, and BFB knew that Shai's father had the means to pay for ongoing family court proceedings and recommended therapeutic intervention, including compelled participation in BFB.

53.     Indeed, the Court's order from January 16, 2020, made clear that Shai would participate in "an intensive TI program of [mother's] choosing, for which father will be 100% [financially] responsible." *See* Exhibit E. <u>Ultimately, Shai's father was compelled to cover 90% of the costs of BFB and related expenses (*e.g.*, the aftercare program).</u>

54.     In Shai's case, Defendants had exactly what they needed: a way to earn a steady stream of income—at the expense of helpless children.

55.     Defendants Moniz, Vigil, Stromfors, BFB, and Rand encouraged Shai and his brother to be enrolled in BFB at the expense of their father, who would be compelled to pay tens of thousands of dollars for the reunification process.

FIRST AMENDED COMPLAINT

56.     Due to Stromfors's Emergency Motion, the court ordered Shai and his brother to attend BFB. *See* Exhibit D.

57.     Accordingly, Shai's father was ordered by the family court to refrain from telling Shai and his brother about BFB and to produce Shai and his brother on January 6, 2021, to the courthouse so that the children could be taken to BFB.

58.     Prior to the granting of the Emergency Motion, Stromfors had—not once—spoken with Shai about his position regarding reunification with his abusive mother.

59.     Pursuant to Judge Astrowsky's Emergency Order, Shai's father was ordered to refrain from telling Shai and his brother about BFB.

60.     As of January 6, 2021, pursuant to Judge Astrowsky's Emergency Order, Shai's parenting time with his father was "suspended" for no less than 90 days, following the completion of BFB and its "aftercare" program.

61.     Shai's concerns regarding the sexual, physical, and mental abuse he suffered at the hands of his mother were completely ignored by Vigil, Branton, and Stromfors.

62.     Amazingly, due to intentional, malicious, wanton, and oppressive motion practice by Defendant Stromfors, the hearing for this Emergency Order ***was not even held*** until approximately nine (9) days after Shai and his brother were taken to BFB.

**(Attending Building Family Bridges Workshop)**

63.     On January 6, 2021, Shai was being treated at Phoenix Children's Hospital for suicidal ideation, which tragically arose after he became aware of the upcoming reunification therapy with his abusive mother.

64.     Prior to being released from Phoenix Children's Hospital, on information and belief, Shai's father was ordered by the family court to leave Shai at the hospital,

- 10 -



unattended, so that the transfer to BFB could occur, regardless of Shai's hospital stay and his obvious need for ongoing treatment.

65.     Upon his premature release, Shai was taken to Oasis, a mental health facility.

66.     After spending about a day at Oasis, Shai was taken to BFB.

67.     Shai had never met the Transport Team before this date, and there were no familiar faces present at the time Shai was accosted by the Transport Team.

68.     On information and belief, when Shai hesitated to blindly follow the Transport Team to their unmarked van, the Transport Team told him that his brother was already in the unmarked van and, if he refused to go, he would not see his brother.

69.     Hesitantly, Shai followed the Transport Team to the unmarked van and got in, finding his scared and anxious brother inside.

70.     Around this time, the Transport Team searched Shai, ensuring that he did not have ~~on~~ any weapons, a cellphone, or other electronic devices.

71.     The Transport Team then drove Shai and his brother over state lines to California, where BFB was to be held.

72.     During the drive, the Transport Team stopped only for gas and food.

73.     The Transport Team members did not allow Shai out of their sight for the entire journey.

74.     While at a gas station, Shai needed to use the restroom but was not allowed to do so without a member of the Transport Team watching him.

75.     BFB was held at the InterContinental Hotel, known as the Crowne Plaza in Ventura Beach, California. When Shai arrived, he noticed signs, put up by the hotel, welcoming him to BFB.

76.     Upon arrival at BFB in Ventura, the Transport Team checked Shai and his younger brother into the hotel and proceeded to sleep in the same hotel room as the two boys on the first night and, again, were present whenever Shai went to the restroom.

77.     Shai was given no privacy from the Transport Team from the moment he was picked up from the hospital.

78.     Shai was given no phone or ability to communicate with the outside world during his time at BFB.

79.     Pursuant to the family court's Emergency Order, Shai was not allowed to communicate with his father at all during the ninety-day switch of custody.

80.     Pursuant to the family court's Emergency Order, BFB was supposed to be led by two licensed therapists.

81.     The morning after Shai arrived at BFB, he was thrown into counseling with his mother, Rand, Vigil, and Verner.

82.     Vigil, who practices therapy in Arizona, flew out to attend BFB, and she did so by charging father's credit card without prior authorization.

83.     Vigil is not licensed to practice therapy in the State of California nor is Rand (who lost his license in 2012). Despite this, Vigil assisted Rand in conducting these intensive "counseling sessions" with Shai, his brother, and mother. Contrary to the family court's order, only Verner was licensed to practice therapy in California.

84.     Shai requested multiple times throughout his first day at BFB, to be sent back home to live with his father. Shai additionally expressed his discomfort with his mother, but his legitimate concerns were wholly ignored.

85.     During the "counseling sessions" Shai brought up why he felt uncomfortable with his mother. Specifically, Shai spoke of the physical, sexual, and mental abuse he suffered at her hands. In response, Shai was ordered by Rand, Vigil, and Verner to "stop discussing past events."

86.     In essence, Shai was ordered to move forward in the process and to stop bringing up the past—despite his justifiable concerns.

87.     Because Shai kept discussing why he was uncomfortable with his mother, Rand, Vigil, and Verner told Shai that if he did not cooperate with their demands— including reporting how wonderful the reunification camp was to the family court (which was used as a justification to deny father's objection to Shai and his brother attending the camp)—they would send him to a "wilderness therapy program" (where Shai would be forced to live outside, under a tarp, for a period of many months) and separate him from his brother.

88.     Shai was silenced by the reunification process and the coercive manipulation he endured at the hands of BFB, Rand, Verner, and Vigil.

89.     Shai, after being threatened with losing more time with his father and separation from his brother if he did not pretend that the reunification therapy was effective, decided to simply sit down and remain quiet.

FIRST AMENDED COMPLAINT



90.     Shai completed the "counseling sessions" at BFB and was then sent home in the full custody of his mother in accordance with BFB's "aftercare program," which was overseen by Defendant Parnell.

91.     Parnell was paid handsomely for her involvement in reuniting Shai and his brother with their abusive mother.

92.     Shai was even forced by Rand, Vigil, Stromfors, Verner, and Parnell to fabricate his experience with BFB to those who asked, especially to those involved in the family court proceedings.

93.     If Shai did not say that the BFB camp and "aftercare" program were a success and that his relationship with his mother was restored, he was threatened with more time away from father.

94.     Shai's ninety (90) day no-contact order with his father was put into place in January of 2021, but unfortunately, the no-contact order lasted much longer than the ninety (90) days—which was an obvious consequence given that BFB is always a permanent switch of custody according to Rand's prior public statements.

95.     As a direct and proximate result of Defendants' actions and omissions, Shai was precluded from having any contact with his father for approximately a ***year and a half***.

**(Post Building Family Bridges)**

96.     After leaving BFB, Shai remained in the exclusive physical and legal custody of his mother in accordance with the "aftercare" program overseen by Parnell.

97.     Because Stromfors, Rand, and Vigil did not sign off on the "aftercare" reports, Shai was continually kept from his father.

98.     The "aftercare" required Shai's relationship with his mother to improve before he could have any contact with his father—which was impossible due to Mother's continuous abuse.

99.     Indeed, after returning to Arizona to live with his mother, on or about January 28, 2021, Shai got into a heated argument with her—resulting in her punching him in the face and giving him a black eye.

100.    This incident was reported to the Scottsdale Police Department during the early morning hours of January 28, 2021, and brought to the attention of father, Stromfors, Vigil, and mother's attorney when an investigator for the Scottsdale Police Department contacted them.

101.    Rather than considering the possibility of physical abuse by mother, Stromfors asked the investigator to stop investigating the incident. During subsequent proceedings in the family court, Stromfors presented fabricated, alternative theories regarding what occurred on or about January 28, 2021.

102.    Based on Stromfors' representations, the family court concluded that no abuse occurred.

103.    The "aftercare" program demanded that "father's role in [Shai's] life should increase as father participates in the prescribed treatments." *See* Exhibit B.

104.    The treatments discussed simply refer to counseling.

105.    If, for any reason, Shai made contact with his father before the initial ninety (90) days after BFB elapsed, the ninety (90) day clock would re-start.



106. As a direct and proximate result of Defendants' actions and omissions, Shai was forced to remain with his mother for approximately **a year and a half**, a person whom he consistently said abused him. Thus, for a period of approximately 420 days:

       a.  Shai was not allowed to be taken to school each morning by his father;

       b.  Shai was not allowed to be picked up each day from school by his father

       c.  Shai was not allowed to ask his father to attend his sporting events;

       d.  Shai was not allowed to ask his father to attend his birthday celebrations or holidays;

       e.  Shai could not call his father.

       f.  Shai could not visit his father; and

       g.  Whenever Shai even mentioned his father to his mother, he was threatened to be taken away from him for even longer.

107. In short, Shai missed out on at least four-hundred and twenty (420) days without his father in his life—for no reason other than to "promote" a relationship with his abusive mother and for Defendants Stromfors, Vigil, BFB, Rand, Verner, and Parnell to financially benefit.

108. At all times alleged herein, Shai did not want a relationship with his mother.

**(Present Time)**

109. Today, Shai is an adult, but he still suffers severely from the emotional trauma resulting from his experience with BFB.

110. As a result of the forced reunification therapy, Shai lost years of precious time with his father during his formative years, which he can never get back.



111.   This loss of time with his father has resulted in severe anxiety, suicidal thoughts, extreme depression, anger, and fear of the judicial process.

112.   Shai has suffered a loss that is difficult to comprehend – for the loss of time and connection to his father is one that should have never been taken from him to begin with.

## Count I:
### Violation of Shai's Fourteenth Amendment Right to Due Process (42 U.S.C. § 1983)
(Shai against Stromfors, Vigil, Rand, BFB, Verner, and Parnell)

113.   Shai realleges and incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

114.   At all times relevant to the allegations in this Complaint, Defendants Stromfors, Vigil, Rand, BFB, Verner, and Parnell acted under the color of state law when implementing protocols designed to ensure that Shai, and other children in similar situations, attend BFB and its "aftercare" program.

115.   At all times relevant herein, the Defendants named in this Claim, were financially motivated to consistently advocate for Shai attend needless, drawn-out therapeutic interventions including BFB. Put simply, the longer a family is subject to the family court's control, and the longer the family is "enrolled" into the court-ordered therapeutic programs and services, such as BFB, the more money the program and the court-appointed practitioners and therapists make.

116.   By their actions and inactions described herein, Defendants Stromfors, Vigil, Rand, BFB, Verner, and Parnell deprived Shai of his procedural and substantive due process rights of familial association under the Fourteenth Amendment of the United States Constitution.  *See Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of*



*Sisters*, 268 U.S. 510 (1925); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) (*overruled on other grounds by Hodgers-Durgin v. de la Vina*, 188 F.3d 1037 (9th Cir. 1999)).

117.    Insofar as the family court—as a direct and proximate cause of Defendants Stromfors, Vigil, Rand, BFB, Verner, and Parnell's actions and inactions as alleged herein—stripped Shai of his parenting time with his father, Shai's rights to companionship and support of his father were unlawfully infringed upon. *Smith*, 818 F.2d at 1418.

118.    Defendants, by dragging out the family court process under the guise of "alienation"—acted according to a widespread and longstanding practice and custom that has been adopted by Defendants to deprive children of their fundamental rights to companionship and support of their loving parents—for the sole purpose of financial gain for those involved as family court appointees.

119.    Defendants' widespread and longstanding practice and custom, as described herein, caused the deprivation of Shai's right to procedural and substantive due process.

120.    Defendants' institution of blindly recommending reunification camps, such as BFB, constitutes a widespread or well-settled practice and custom that provides for a standard operating procedure with respect to other minor children in similar situations. Indeed, the situation is so bad in Arizona, that the Legislature outlawed the practice of "reunification camps" just this year.  A.R.S. § 25-418 (signed into law April 16, 2024).

///

///

///

///

FIRST AMENDED COMPLAINT



**Procedural Due Process**

121.    Shai's right to procedural due process throughout his parents' custody battle was not only overlooked—but completely abandoned—by those appointed to represent his best interests.

122.    From the outset of Vigil's appointment as the TI, she began to work in tandem with Moniz (her attorney), Stromfors, Rand, and the family court system to ensure Shai would be sent to BFB (as opposed to any other program).

123.    The concept of "parental alienation" is not defined by statute, is not a claim supported by common law, has no definite list of criteria to establish that it has occurred such that its utilization is wholly arbitrary, and triggers a litany of unlawful protocols that allows for the denial of due process by giving far more discretion to therapists, Best Interest Attorneys, and other practitioners than is allowed by law.

124.    On information and belief, Moniz, Vigil, Stromfors, Rand, Verner, and Parnell, were, at the time of these events, aware of the facts in paragraph 113.

125.    Defendants Moniz, Vigil, Stromfors, Rand, Verner, and Parnell, deceptively abused the authority of the family court to remove Shai from the safe custody and care of the comfort (*i.e.*, non-abusive) parent—based upon the unnecessary appointment of a Best Interest Attorney—by completely denying the subject child of all contact with the comfort parent—even though the comfort parent has not been deemed "unfit" to act in the best interest of his or her child in violation of law. *See e.g.*, *Troxel v. Granville*, 530 U.S. 57, 68 (2000).

126.    Shai expressed over months of therapy with court appointed interventionists that he *was* comfortable and stable with his father – his comfort parent.

127.    Shai expressed over the same time frame to the same individuals that he *was not* comfortable with his mother because she had sexually, physically, and mentally abused him.

128.    Stromfors, Vigil, Rand, BFB, Verner, Parnell and the family court were made aware of these accusations and had a duty to safeguard Shai (who, at the time, was a minor child) from further abuse—but they made no such effort.

129.    On information and belief, Moniz, Vigil, Rand, BFB, and Stromfors had made arrangements for Shai to attend BFB—before getting permission from the Court or consent from Shai.

130.    Stromfors, Shai's attorney, had **not once** spoken to Shai prior to Shai being sent to BFB.

131.    Stromfors, Shai's attorney, had spoken with mother and her attorney, Vigil, Rand, and BFB prior to her Petition for Emergency Order on December 28, 2020.

132.    Stromfors, Shai's attorney, made clear in her Petition for Emergency Order that she **had not** spoken with her client, Shai.

133.    Stromfors, Shai's attorney, made clear in her Petition for Emergency Order that she **had** spoken with mother, Vigil, Rand, and BFB regarding sending Shai to BFB.

134.    Vigil, Stromfors, and Rand allowed for Shai to be taken from a hospital where he was being treated for suicidal ideation, into an unmarked van with an unknown Transport Team, and over Arizona state lines into California to be reunited with his abusive mother.

135.    Vigil, Stromfors, Rand, and BFB followed a widespread custom pervasive in the family court system in removing Shai from his father's care and forcing him into the arms of his mother, with whom he felt no comfort of safety.

136.    Vigil, Stromfors, Rand, and BFB removed Shai from his father's custody with no good faith basis in fact or law.

137.    On information and belief, Vigil, Stromfors, Rand, and BFB removed Shai from his father's custody on an Emergency Order, barring any imminent danger to Shai, holding the emergency hearing **only after Shai left to attend BFB**.

138.    At the time Shai was abruptly ripped away from his father's care, there was no concern that Shai's father was abusing him or that Shai's father was an imminent threat to Shai.

139.    Indeed, as the family court inexplicably made clear, it expected Shai's father to *coerce* Shai into being receptive to his abusive mother. *See* Exhibit F.

140.    Because of father's unwillingness to *coerce* Shai into such a relationship, Shai's relationship with his father was unlawfully terminated for approximately a year and a half in violation of Shai's constitutional rights secured by the Fourteenth Amendment.

141.    Indeed, the import of the family court's record clearly demonstrates that Shai's mother had a history of abusing him and was an imminent threat to Shai's physical and mental health.

142.    Vigil, Stromfors, Rand, and BFB deceived the judicial process by claiming that Shai's mother was "alienated" and that it was in the best interest of Shai to be sent to a costly reunification camp—which was to be paid for by his father.



143.   Vigil, Stromfors, Rand, and BFB had a reckless disregard for what Shai needed. Stromfors, who had a duty to represent Shai's best interests, utterly failed by never communicating with her client.

144.   If not for the continual deception of Vigil, Stromfors, Rand, and BFB, Shai would have never been sent to BFB or its "aftercare" program.

145.   Removing Shai from his father's custody, with no reasonable cause, was a direct violation of Shai's procedural due process rights.

**Substantive Due Process**

146.   Shai's right to substantive due process throughout his parents' custody battle was not only overlooked but completely abandoned by those appointed to represent his best interests.

147.   Vigil, Stromfors, Rand, and BFB acted according to a widespread and longstanding practice and custom that they adopted to abuse the family court process in Arizona to remove children from their caring parent and place them with their abusive parent.

148.   Defendants' institution of blindly recommending reunification camps, without any reasonable basis, constitutes a widespread or well-settled practice and custom.

149.   Defendants' actions in depriving Shai of substantive due process, from the initial appointment of Vigil and Stromfors through the "aftercare" program, shocks the conscience.

150.   Shai was deprived of time, companionship, comfort, and care of his father for over **a year and a half** following a baseless Emergency Order.

151.   Moniz, Stromfors, and Vigil colluded with Rand, and others at BFB, to secure a spot for Shai prior to securing any authorization by the family court to place Shai in the program.

152.   Vigil, Stromfors, Rand, and BFB acted with a deliberate indifference to Shai's rights and ignored his pleas for help when they reunited him with his abusive mother. Vigil, Stromfors, Rand, and BFB were not in a hurried state nor were required to make impulsive decisions regarding Shai's custody status in December of 2020.

153.   Vigil, Stromfors, Rand, and BFB impermissibly interfered with Shai's familial association with his father. *See* Exhibits B, D.

154.   Vigil, Stromfors, Rand, and BFB had a duty to protect Shai and failed to do so—causing him more harm—including physical abuse by his mother after the BFB program concluded in late January of 2021.

155.   Vigil, Stromfors, Rand, and BFB knew that the reunification process was lengthy, unnecessary, wholly lacking any evidentiary support (apart from publications by self-interested "experts" that base their findings on aggregating data from self-reporting children, like Shai, who are compelled to answer questionnaires about their experience with the reunification process while under duress) and leads to children to being permanently kept aware from the parent with whom they feel comfortable.

156.   Vigil, Stromfors, Rand, and BFB knew that Shai was scared to be with his mother—yet they failed to safeguard him from her abuse.

157.   As a direct and proximate result of Vigil, Stromfors, Rand, and BFB sending Shai to BFB and its "aftercare" program, Shai was further physically and mentally abused by his mother.



158.   As a direct and proximate result of Vigil, Stromfors, Rand, and BFB sending Shai to BFB and its "aftercare" program, Shai lost precious time with his father and suffered emotional and physical abuse.

159.   Vigil, Stromfors, Rand, and BFB caused a ninety (90) day no-contact order to be put into place between Shai and his father.

160.   On information and belief, Vigil, Stromfors, Rand, and BFB knew that the ninety (90) day no-contact order was illusory and—indeed—Rand has previously, publicly stated that BFB acts as a *permanent* switch of custody.

161.   On information and belief, a statistical review of the outcomes from BFB participants will show a near 100% rate of children being permanently transferred to the custody of the non-comfort parent—even though Defendants represented to the family court (as is their custom and practice) that the program is intended as a temporary switch of custody.

162.   Upon completing the multi-day BFB camp, Shai continued to be in the exclusive custody and control of his abusive mother.

163.   This custody order would remain intact until the BFB "aftercare" program was completed.

164.   Vigil, Stromfors, Rand, Parnell and BFB did not reasonably allow for the completion of the "aftercare" program for the purpose of collecting ongoing payments from father.

165.   The actions and inactions made by Defendants listed in this cause of action were intentional, malicious, wanton, and oppressive to a degree that *shocks the conscience* of what Shai had to endure.



## Appointment of BIA Lacked Procedural Due Process

166.    Unfortunately, there are multiple levels here that involve a lack of procedural due process.

167.    Defendant Stromfors was appointed by the family court to act as the BIA for Shai and his younger brother. However, Judge Astrowsky did not give any reason as to *why* a BIA was necessary nor did he find that Shai's father was "unfit" to act in Shai's best interest in violation of Shai's rights secured by the Fourteenth Amendment. *See Troxel*, 530 U.S. at 68.

168.    As BIA, Stromfors abused her authority to interfere with Shai's liberty interest in companionship with his father in violation of Shai's due process rights—for the sole purpose of dragging out the family court proceedings and, thereby, benefiting financially.

169.    As a result of the facts listed in this Complaint, Shai was deprived of his right and interest in being in the companionship, control, comfort, care, and custody of his father, who was his legal custodian at the time.

170.    As a direct, proximate, and foreseeable result of Defendants' conduct, Shai has incurred special and general damages, the precise amount of which will be proven at trial.

171.    As alleged herein, Defendants actions and inactions in depriving Shai of his constitutional rights were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

///



### <u>Count II:</u>
### Conspiracy to Interfere with Civil Rights <u>42 U.S.C. § 1983</u>
(Shai against Defendants Branton, Stromfors, Vigil, Rand, and BFB)

172.   Shai realleges and incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

173.   At all times relevant herein, Branton, Stromfors, Vigil, Rand, and BFB acted under the color of state law.

174.   At all times alleged herein, these Defendants were aware that BFB is a for profit organization.

175.   The Defendants listed in this cause of action knew that the more time a family is forced to participate in court-appointed interventions like BFB, the more money these court appointed therapists, attorneys, and practitioners would make.

176.   On information and belief, Rand has made clear that BFB **is not** a temporary solution—although it was presented as such to the family court by Defendants Vigil, Stromfors, Rand, BFB, and is described as such in family court order. *See* Exhibit G.

177.   Rand has made clear that BFB is a permanent change of custody. *See* Exhibit G.

178.   Vigil and Stromfors made their recommendation for Shai to attend BFB after speaking with Rand and, upon information and belief, other unknown employees of BFB.

179.   As a direct result of these Defendants' actions, Shai spent nearly a year and a half in BFB and its "aftercare" program.

180.   Shai was forced to forgo contact with his father for that entire time.



181.   As a result of Defendants conspiring to send Shai to BFB, with no good faith basis but to earn money, the Defendants listed in this cause of action conspired to and, in fact, interfered with Shai's liberty interest in familial association and companionship with his father that is guaranteed by the Fourteenth Amendment's procedural and substantive due process protections.

182.   As a direct, proximate, and foreseeable result of the conduct of the Defendants listed in this cause of action, Shai has incurred special and general damages, the precise amount of which will be proven at trial.

183.   As alleged herein, the actions and inactions of Defendants Branton, Stromfors, Vigil, Rand, and BFB that directly and proximately deprived Shai of his constitutional rights were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

**<u>Count III:</u>**
**Retaliatory Harassment 42 U.S.C. § 1983**
(Shai against Branton)

184.   Shai realleges and incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

185.   At all times relevant herein, Branton acted under color of state law.

186.   Branton was appointed by the family court to be Shai's psychologist.

187.   Per the family court's order, Branton would see Shai and his brother regularly.

188.   Branton's initial report to the Court on April 17, 2019, portrayed a very strained relationship between Shai and his mother. *See* Exhibit H.



189.   On numerous occasions, Shai expressed to Branton that his mother was abusive sexually, physically, and mentally. *See* Exhibit H.

190.   In Branton's report to the Court, he expressed that Shai did not do well speaking of his mother, and being forced to spend time with her was not in his best interests. *See* Exhibit H.

191.   Branton's reports make clear that, if any kind of reunification process were to occur between Shai and his mother, there would need to be a "weeks" of intensive therapy before slowly reintegrating parenting time with mother. *See* Exhibit H.

192.   Branton's report explains that Shai should be in a "safe and neutral place" for him to heal. *See* Exhibit H.

193.   However, June 2, 2020, Branton recused himself from the case after hearing a rumor that Shai's father might have recorded his interactions with Branton.

194.   Branton was upset at this and, consequently, he proceeded to tell Shai that he did not believe Shai's allegations of abuse by his mother.

195.   Shai felt hurt and ashamed after trusting Branton with his vulnerability.

196.   When Branton recused himself from the case, he did not change his position that Shai's father was still a safe space for him and that any reuniting with Shai's mother would take "weeks" of intensive therapy to prepare him.

197.   Months after Branton's recusal, Vigil called Branton acting as a court-appointed therapeutic interventionist and discussed the idea with Branton of sending Shai to BFB.

198.    Branton, upon information and belief, was aware that BFB would not allow Shai a slow integration of time with his mother but, instead, would require immediate reunification, agreed that this course of action would be acceptable.

199.    This is a stark contrast to the professional opinion that Branton had reached just months prior.

200.    Only after Branton was forced to recuse himself and lose his income from Shai's case, did he opine that BFB was appropriate.

201.    Branton's stark reversal of positions was done to retaliate against Shai and his father for losing his income related to Shai's family court proceedings.

202.    As a result of Branton's retaliatory actions, Shai suffered severe emotional distress, anxiety, depression, physical injury, and loss of familial association (companionship) with his father.

203.    As a direct, proximate, and foreseeable result of Branton's conduct, Shai has incurred special and general damages, the precise amount of which will be proven at trial.

204.    As alleged herein, Branton's retaliatory actions in depriving Shai of his constitutional rights were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

**Count IV:**
**Violation of Shai's First Amendment Right to Freedom of Association**
(Shai against Defendants Stromfors, Vigil, Rand, BFB, Verner, and Parnell)

205.    Shai realleges and incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

206.    Specifically, Shai incorporates paragraphs set forth in Count I, regarding the elements for substantive due process, relating similarly to this Claim herein.



207.   Shai had a right to substantive due process when the Defendants Stromfors, Vigil, Rand, BFB, Verner, and Parnell acted in concert with one another to deprive Shai of his First Amendment right to freely associate with his father.

208.   These Defendants' actions were designed to, and had the effect of, interfering with Shai's ability to exercise his right to freely associate with his father.

209.   As stated herein, Defendants' curated custom of forcing minors involved in contested custody disputes into reunification camps, including BFB, had the ultimate intent and effect of depriving Shai (and other children in like positions) of his right to freely associate with his father.

210.   At all relevant times to this Complaint, Shai's father was not found to be an imminent threat or danger to him and was not found to be "unfit" to act in his best interests.

211.   However, there was ample evidence, including reports from Shai, his brother, and his father, which established Shai's mother was abusive in multiple respects.

212.   Shai's right to freely associate with his father was intentionally destroyed by the Defendants listed in this cause of action simply because they used the farcical concept of "alienation" as a tool to make money.

213.   As a direct, proximate, and foreseeable result of the conduct of the Defendants listed in this cause of action, Shai has incurred special and general damages, the precise amount of which will be proven at trial.

214.   As alleged herein, Defendants' actions and inactions in depriving Shai of his right to freely associate with his father were willful, wanton, malicious, and oppressive,



and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

**Count V:**
**Battery and Sexual Battery**
(Shai against Moniz)

**Battery**

215.    Shai realleges and incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

216.    Shai's mother intentionally, unlawfully caused harmful bodily contact to Shai by punching him in the face on or about January 28, 2021.

217.    This interaction left Shai with a black eye and emotional trauma.

218.    Shai did not consent to being touched by his mother before she punched him in the face.

219.    Shai's mother intended to touch him and harm him when she punched him, leaving him with physical injury and emotional stress.

220.    As a direct and proximate result of being punched in the face by his mother on or about January 28, 2021, Shai has incurred special and general damages, the precise amount of which will be proven at trial.

**Sexual Battery**

221.    Along with the physical and mental abuse Shai suffered at the hands of his mother, she also abused him sexually.

222.    Shai has consistently made the following allegations, before and after attending BFB.

223.    From the age of three (3) to ten (10) years old, Shai's mother would regularly sleep naked with Shai.

224.    Shai felt uncomfortable with this arrangement and, as he got older, he felt increasingly uncomfortable.

225.    During this time, Shai's mother would encourage him to play with her breasts—even though it made him uncomfortable.

226.    At various times, Shai expressed these concerns to his father, who made proper authorities aware of the abuse but, unfortunately, the authorities did not act to protect Shai.

227.    On or about December of 2012, Shai woke up in his mother's bed, naked and lying on top of her (or vice versa) as she was also naked. Shai specifically recalls, and is traumatized by, the feeling of his mother's pubic hairs touching his private parts.

228.    Shai felt highly embarrassed and ashamed by this incident.

229.    Shai never consented to being sexually touched by his mother and lacked consent as a minor at all relevant times herein.

230.    At all relevant times, Shai's mother's actions in sexually abusing him were intentional.

231.    Even today, Shai still suffers from serious anxiety, stress, and confusion relating to the unwanted sexual touching by his mother.

232.    The instances of Shai's mother sexual abusing him was minimized throughout the custody proceedings, but these events still impact him negatively to this day.

FIRST AMENDED COMPLAINT



233.   As a direct and proximate result of being sexually abused by his mother, Shai has incurred special and general damages, the precise amount of which will be proven at trial.

### DEMAND FOR JURY TRIAL

234.   Shai, through his undersigned counsel, hereby requests a trial by jury as to all triable issues.

### PRAYER FOR RELIEF

WHEREFORE, Shai prays for judgment against all Defendants named herein, as follows:

A.  Special and general damages in an amount to be determined by proof at trial;

B.  Punitive and exemplary damages in an amount to be proven at trial;

C.  Medical and related expenses in an amount to be determined by proof at trial;

D.  Attorney fees, costs, and expenses as authorized by 42 U.S.C. § 1983 and 42 U.S.C. § 1988 according to proof;

E.  Interest according to law;

F.  Costs of this action; and

G.  For such other relief as the Court may deem just and proper.

DATED this 26th_day of July, 2024.

Respectfully submitted,

By:   /s/ RYAN L. HEATH
Ryan L. Heath, ESQ (036276)
HEATH LAW, PLLC
16427 N. Scottsdale Rd., Suite 370
Scottsdale, Arizona 85254
(480) 432-0208
ryan.heath@heathlaw.com

1    *Attorney for Plaintiff*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT